In the United States District Court
for the Northern District
of West Virginia

FILED

AUG 1 2019

U.S. DISTRICT COURT-WVND
MARTINSBURG, WV 25401

John Polhill, IV,

BIVENS

v.

Doc. # 5:19CV 233

Department of Justice

Bailey, Mazzone, Blalock

Federal Bureau of Prisons,
A municipal corporation operating under
West Virginia Law

Micheal Smearman,
In his individual and fiduciary / official capacity

J. Palmer,
In his individual and fiduciary / official capacity

Complaint for Injunctive and
Declaratory Relief

Plaintiff, John Polhill, an inmate confined at
the Federal Correctional Institution Hazelton, P.O.
Box 5000, in Bruceton Mills, West Virginia 26525;
Complaining of defendants, states as follows:

1. On June 4, 2019, at approximately 11:30 am
Mr. Palmer and Mr. Smearman, committed acts
against Federal Bureau of Prisons Policy,
Program Statement 3420.11; Standards of Employee
Conduct ___ (Dec. 6, 2013), and Substantive Rights
Retained by Prisoners; And did so with malice,
ill-will and intentions of damaging Polhill as
well as cause damage to Polhill's good
standing in the federal Bureau of Prisons.

(1)

The facts are as follows: On June 4, 2019, Polhill reported to his work assignment (food service) at the correctional institution. This assignment consists of Polhill preparing food trays for inmates housed in Special Housing Unit (SHU); and requires staff to convey detailed information, such as, how many inmates are isolated, if they have special diets, and or any food allergies. Upon Polhill's attempt to retrieve this information from Mr. Palmer, a chain of events had transpired which led to this complaint.

2. Polhill will show, beyond a reasonable doubt, that Mr. Palmer and Mr. Smearman did act with malice, ill-will and intentions to damage Polhill as well as cause damage to Polhill's good standing in the Federal Bureau of Prisons (FBOP).

3. On June 4, of 2019 I, Polhill located my shift supervisor (Mr. Palmer) in his office and knocked on the door to gain entry, for verification of total number of inmates in SHU, and their specific diets. Mr. Palmer acknowledged and I entered. Upon obtaining this required information Mr. Palmer appeared to be agitated and responded with, "Not right now." So, I asked to be taken off of the four (4) o'clock census count,¹ before it was too late. At that time

¹ Ramadan is an Islamic holy day that consists of 28-30 days of fasting from dawn to dusk. As a SHU worker, I am not on the 4 o'clock count, only during Ramadan am I on count. So, from 11:30am-9pm I am in the kitchen working, doing my regular shift, then helping prepare the meals for Ramadan participants.

Mr. Palmer jumped from his seat and said, "What the fuck did I just tell you? How many times has someone told you not to bother me when I'm in my office? When you see me on the floor you can ask me whatever you want. Now get the FUCK away from my door!" (An employee may not use profane, obscene, or abusive language when communicating with inmates ... shall conduct themeselves in a manner that will not be demeaning to inmates.) §5(c). I assured Mr. Palmer that I was a man and demand respect, and he stated "So do I" and yelled "Get away from door!" 3 times, getting louder each time and then slammed the door in my face. There is a glass window on the door, so, we were both visible to one another. Again, I assured Mr. Palmer that that too was disrespectful and slamming the door did not make him any tougher nor less threatening than he'd already become. See, Inmate Admission & Orientation Handbook, Rights and Responsibilities, ("You have the right to expect that you will be treated in a respectful, impartial, and fair manner by all staff). Mr. Palmer then opened the door and asked, "What do you want to do?"... with an intimidating tone. Then stepped mid-stride and said "you know what? Your done! Get out of here, you're fired!" (An employee may not use brutality, physical violence, or intimidation toward inmates) §5(c), of Program Statement; see also, A&O Handbook, Rights and Responsibilities: An inmate have

the Right to participate in education, vocational training, and "employment" as far as resources are available and in keeping with his interests, needs, and abilities.

4. I went to leave the area of the kitchen, (Food Service), to return to my housing unit, Mr. Palmer signaled for his Supervisor (Michael Smearman) who was also in the kitchen area. As I made it halfway through the dinning hall, I was called back by both staff (Smearman and Mr. Palmer).

5. Mr. Palmer conversed with Mr. Smearman in front of me; the conversation went as follows: Mr. Palmer said, "When John Polhill comes up to you whining about getting his job back; I have told him, his muslim brothers[2] has told him, [d]on't come to my office," mocking the matter. I tried to intervene and Mr. Smearman snapped, "Shut the fuck up!" I was shocked by his impulsiveness. (the Bureau ~~expects employees~~ expects it's employees in a manner that fosters respect for the Bureau of Prisons, the Department of Justice, and the U.S. Government). P.S. §4. the employees named in this complaint actions are obviously contrary.

---

[2] You have the right to freedom of religous affiliation, and voluntary worship.

6. Without any further delay from Staff I walked out of the kitchen. I was called back once again, but didn't respond. And kept walking. I was pursued and ordered more forcefully to stop and come back. I took a few breaths then turned to the approaching Staff. I'd placed boths hands in my pockets, as I stood to listen. I was told to remove my hands; I complied and crossed them in feaut of my belt buckle.

7. In Regards to Mr. Smearman, he began stating explicit and derogatory remarks as I walked away. Both Mr. Palmer and Mr. Smearman proceeded to walk out with me when they had no reason to. Smearman told Mr. Palmer that he had the situation under control; referring to me. Mr. Smearman walked side-by-side with me from the kitchen, down the compound until we reached compound staff and the Lieutenant on duty. The entire walk Mr. Smearman cursed and spoke degradingly; while I laughed off his poor attempts to provoke me to lash out at him. He called me a "Cho-mo", (which is slang for a child molester), a title and/or name that poses a substantial risk of bodily harm and danger in prison. He went on to say "You like sucking on little boys dicks, don't you? You little faggot!"

8. I told Smearman that he wanted me to do something crazy, just so he could spray me with his mace. Mr. Smearman grabbed his mace and said he didn't need it, he'll give it to Jimmy (Mr. Palmer), "I'll give it

to him." "I don't need this radio either, I'll turn it off." He conceded and turned his radio off, in what appeared to be him acting in good faith. He called out to Mr. Palmer, "here, here, here!" Mr. Palmer didn't move, as if he knew Mr. Smearman's action and words was a play to give me the courage to strike or cause me to become cretin. Either way I didn't take the bait.

9. Once Mr. Smearman noticed I wouldn't bite, he returned the mace to its holster and turned his radio back on; and continued the verbal abuse and threatening me. "Your gonna have hell on this compound. Everybodys gonna hate you! Lts, Compound Staff, Wardens ... everyone!" He said, "I'm going to get you sent to the west coast." Contemplating the worst possible punishment, he stated, "No the ADX!" Referring to the Super Max, Federal Prison in Colorado.

10. As we walked, we passed a few inmates that were out on the compound. Mr. Smearman would then state in a calm voice, "tell me how can I help you?" I did not respond and kept walking; as I approached my housing unit. Mr. Smearman asked, what Unit was I in? I replied; "N-Unit." He said, okay, I'll walk you. As we came near the buildings pathway for entry, Mr. Smearman told me to keep walking and that I was going to the SHU. He said, "Do you see that Lt? Keep walking to him your going to the box."

11. When we made it to Compound Staff and Lieutenant, MR. Smearman said to the Staff that I was giving him a hard time... Not that I had an incident report, Not that I had threatened staff or even used abusive language. Just that I was giving staff a hard time.[3] Then he stated that I needed to go to the SHU. Without delay, Compound oblivious to any institutional infraction or incident report, took Mr. Smearman's word and told me, that I would be doing some extra duty.

12. Mr. Smearman left and Compound staff said to me that, I would be picking high weeds. Compound Staff and I spoke for a while, and he admitted that he's never had any trouble with me, but he had to take his colleagues word over mine. I thanked him for his honesty and I understood. I picked high weeds around the institutions compound until the actual landscape work crew arrived.

13. It is appearant that the goal of the defendant's in this case is predicated on radicalized behavior, racial profiling, and stereo-type. The actions taken by the defendant's has caused Polhill to miss 2 (two)

_____

[3] Disciplinary Procedures; Inmate Discipline Information: When a staff member witnesses or reasonably believes an inmate has committed a prohibited Act, a staff member will issue an incident report, a written copy of the charge against an inmate. The incident report will ordinarily be delivered to the inmate within 24 hours of the time staff became aware of the inmates involvement in the incident.

months pay of work. [Without complying with the BOP's Policy of terminating inmates from a work assigned Assignment]. Due to the current situation, Polhill (like most inmates) cannot afford to lose his employment.

14. The defendant's in this action reside at Federal Correctional Institution Hazelton, 1640 Sky View Drive, P.O. Box 460, Bruceton Mills, WV 26525.

15. Plaintiff is entitled to relief from the defendants under the above facts.

16. The harm caused by the defendants acts include but are not limited to:

  1. Loss of pay and employment.

  2. Deprivation of the right to a fair hearing/trial (due process rights).

  3. Cruel and Unusual punishment.

  4. Humiliation/embarrassment.

  5. Undue emotional stress.

Wherefore, Plaintiff requests judgment against defendants to stop and desist from radical, racist and stereo-typical acts, and wherefore Plaintiff also request judgment against defendants for damages, together with costs of suit; and a temporary restraining order pending the out come of this case, and any other relief as the court may deem proper.

Dated: 7/29/19                    Signature: John Palhill IV

Pursuant to 28 USC § 1746(1)


JURY DEMAND

The Plaintiff demands trial by A jury on All off the triable issues of this Complaint, pursuant to West Virginia Court Rules.